*Execution Copy*

# INTERIM MANAGEMENT AGREEMENT

This Interim Management Agreement ("Agreement") is entered into as of September __, 2025 (the "Effective Date") by and among Kenneth Silverman, Esq., solely in his capacity as the duly appointed Chapter 7 trustee ("Trustee") of the jointly administered bankruptcy estates of NeueHouse, Inc. ("Debtor"), 25 Park LLC ("Landlord"), and CHG MSQ Manager, LLC ("Manager"). The Trustee, Manager, and Landlord are each a "Party" and collectively the "Parties."

RECITALS

A. Debtor and Landlord entered into that certain [Lease Agreement dated June 15, 2012] (the "Lease"), pursuant to which Debtor leases that certain real property commonly known as 104-110 East 25th Street, New York, New York 10010 (the "Facility").

B. Debtor operated a social club, events and co-working space at the Facility formerly known as "NeueHouse Madison Square" (the "Business").

C. On or about September 5, 2025, the Debtor commenced a case under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Case No. 25-11937 (MG). The Trustee is the duly appointed and acting Chapter 7 trustee of the Debtor's estate (the "Estate").

D. As of September 5, 2025, Debtor ceased operating the Business and the Trustee desires to preserve and maximize the going-concern value of the Estate for the benefit of creditors through a limited, interim operation of the Business at the Facility, and intends to sell substantially all assets of the Debtor relating to the Facility (the "Sale").

E. Landlord desires to consent to the limited, interim operation of the Business at the Facility as set forth herein.

F. Manager is willing to operate the Business at the Facility on an interim basis on the terms herein solely to preserve and enhance value pending closing of the Sale, with Manager advancing startup and operating costs, subject to the distributions provided below.

G. The Parties desire to set forth their respective rights and obligations with respect to the interim operation of the Business at the Facility upon and subject to the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein, the Parties agree as follows:

1. **Appointment Status; No Lease or Assumption.**

    a. Appointment. The Trustee hereby appoints Manager as the exclusive interim manager and operator of the Business at the Facility, and Manager accepts such appointment, subject to the terms of this Agreement.

b. Independent Contractor. Manager is an independent contractor. Nothing herein shall be construed to create or imply a partnership, joint venture, agency (except limited authority set forth herein), or employment relationship among the Parties.

c. No Lease; No Assumption. This Agreement is not a lease or sublease and does not constitute assumption or assignment of any executory contract or unexpired lease under the Bankruptcy Code. Manager does not assume any prepetition or post-petition obligations of the Debtor or the Estate, which shall remain liabilities of the Estate, unless expressly assumed in writing by Manager.

2. **Term; Court Approval; Early Termination.**

   a. Term. This Agreement shall commence upon the Effective Date and continue until the earlier of (i) ninety (90) days after the Effective Date, or (ii) the closing of the Sale of the Debtor's assets relating to the Business at the Facility (the "Term"). The Parties may extend the Term by unanimous written consent.

   b. Court Approval (§721 Operating Order); Lender Approval. To the extent required by the Bankruptcy Code, the effectiveness of this Agreement, and Manager's authority to operate the Facility, are subject to (i) entry of an order by the Bankruptcy Court under 11 U.S.C. § 721 (and, to the extent applicable, §§ 105, 363 and 364) authorizing the Trustee to operate the Business on an interim basis (the "§721 Operating Order"), and (ii) the written consent of Landlord's lender(s) (if applicable). The Parties shall cooperate to promptly seek and support such approval. If the Bankruptcy Court and/or Landlord's lenders denies approval, this Agreement shall be null and void ab initio.

   c. Early Termination for Cause. Any Party may terminate this Agreement upon written notice to the other Parties if any other Party materially breaches any provision of this Agreement and fails to cure such breach within five (5) business days after receipt of written notice from the non-breaching Party specifying the nature of the breach in reasonable detail; provided that Manager may immediately suspend operations if the Manager determines, in its sole discretion, that continued operations pose an imminent threat to health, safety or property or would result in a violation of any applicable law, regulation or governmental order.

3. **Scope of Services; Authority; Contracts.**

   a. Scope. Manager shall operate the Business at the Facility and, in connection therewith, shall provide member services, sales and marketing, staffing, maintenance, purchasing, and accounting services necessary for the day-to-day operation of the Business. Upon the execution hereof, the Trustee shall promptly furnish to the Manager all contracts and records (including, without limitation, agreements for internet and security services) pertaining to the Business.

   b. Authority. Manager may take actions customary and necessary for the operation of the Business at the Facility, including entering into purchase orders and operating agreements, provided no agreement shall without Trustee's and Landlord's prior written consent (x)

2

exceed the Term or 90 days from execution of such agreement (whichever is longer), or (y) involve payments exceeding $100,000 in the aggregate per agreement.

    c. <u>No Disposition of Assets</u>. Manager shall not sell, encumber, or dispose of any assets of the Estate other than inventory, supplies, and perishable goods in the ordinary course of operation, absent Trustee's written consent.

4. **<u>Funding; Accounts; Costs; Shortfalls.</u>**

    a. <u>Startup and Operating Costs</u>. Manager shall be responsible, at its sole cost, for funding all startup costs associated with reopening and operating the Business at the Facility, including staffing costs, wages and benefits, supplies, software, licenses and permits fees, credit-card fees, insurance attributable to operations, utilities, repairs and maintenance, and other ordinary course expenses.

    b. <u>Operating Account</u>. Manager shall establish and control a dedicated operating bank account for the Business (the "Operating Account"). All revenues from the Business shall be deposited into the Operating Account. Disbursements from the Operating Account shall be limited to the operating expenses and reasonable working capital reserves of, and distributions from the Business as set forth in Section 7.

    c. <u>Shortfalls</u>. Manager shall be responsible for any operating shortfalls of the Business during the Term.

5. **<u>Customer Deposits; Subaccount; Application and Remittance</u>**. For purposes of this Agreement, "Customer Deposits" means deposits, prepayments, or credits paid to the Debtor or the Estate by customers for events, memberships, or services of the Business at the Facility prior to the Effective Date.

    a. <u>Release to Manager; Deposits Subaccount</u>. The Trustee shall promptly release and remit to Manager all Customer Deposits relating to the Business, together with a schedule of depositors, amounts, dates, and associated contracts. Manager shall hold such funds in a segregated sub-account within the Operating Account titled "Deposits Subaccount" and maintain a detailed ledger.

    b. <u>Election to Honor; No Assumption</u>. Manager may, in its sole discretion and without assumption under 11 U.S.C. § 365, elect to honor specific prepetition customer contracts or bookings by applying corresponding Customer Deposits from the Deposits Subaccount toward the goods/services provided. Any such performance and application of funds shall not constitute an assumption, adoption, or cure of any executory contract or unexpired lease, nor create administrative expense claims beyond amounts actually applied.

    c. <u>Unused Deposits; Remittance</u>. Customer Deposits not applied by Manager during the Term shall remain in (or be returned to) the Deposits Subaccount and be remitted by Manager to the Trustee within ten (10) days after expiration or termination of this Agreement, together with the final deposit ledger.

    d. <u>Chargebacks; Disputes</u>. The Estate shall remain responsible for prepetition credit-card chargebacks and customer claims relating to periods before the Effective Date; provided, however, that if a chargeback directly relates to a Customer Deposit that Manager has already applied for an event performed during the Term, the Parties shall confer in good faith to equitably allocate responsibility based on benefit received.

    e. <u>Reporting</u>. The monthly report under Section 8 shall include the Deposits Subaccount activity, including beginning and ending balances, applications by event/contract, and the amount to be remitted to the Trustee and Landlord, if any, and such other related information reasonably requested by Trustee or Landlord.

6. **Revenues; Definition of EBITDAR**. For purposes of this Agreement, "EBITDAR" means earnings before interest, income/franchise taxes, depreciation, amortization, and rent, generated from operations of the Business during the applicable period, calculated as total operating revenues (including membership fees, event revenue, food and beverage, ancillary and service charges) minus operating expenses (including labor and benefits, ordinary repairs and maintenance, supplies, software subscriptions, insurance attributable to the Business, utilities, merchant processing fees, and sales/use taxes), but excluding (i) debt service, (ii) income or franchise taxes of any Party, (iii) capital expenditures, and (iv) corporate overhead of Manager other than expenses specifically incurred for operation of the Business.

7. **Distributions; Waterfall; Timing**.

    a. <u>Waterfall</u>. Within fifteen (15) days after each calendar month-end, Manager shall prepare a monthly statement and, subject to Section 7.a. and Manager retaining a reasonable working capital reserve not to exceed $200,000 (unless otherwise agreed in writing), distribute available cash from operations for such month as follows: (1) pay Business operating expenses then due and payable; then (2) distribute the resulting EBITDAR for such month as follows: fifty percent (50.00%) to the Trustee (for the Estate), twenty-five percent (25.00%) to Landlord, and twenty-five percent (25.00%) to Manager.

    b. <u>Negative EBITDAR</u>. If EBITDAR for any month is negative, (i) no distribution shall be made for such month, (ii) Manager shall fund such shortfall pursuant to Section 4(c) and (iii) no distribution for any subsequent month shall be payable unless and until Manager has received an amount of EBITDAR equal to such shortfall.

    c. <u>Method</u>. Distributions shall be made by ACH pursuant to written instructions provided by each recipient.

8. **Reporting; Records; Audit**. Manager shall deliver to both the Trustee and the Landlord, within fifteen (15) days after each month-end, a written monthly report detailing the revenue generated for the prior month, a detailed breakdown of expenses, calculation of EBITDAR, and the distribution amounts under Section 7 and such other related information reasonably requested by Trustee or Landlord. Manager shall maintain complete and accurate books and records for the Business in accordance with U.S. generally accepted accounting principles (or another reasonable,

4

consistently applied basis) and will make such records available for inspection by the Trustee and Landlord upon reasonable notice.

9. **Employees; Compliance.**

    a. **Employees.** All employees of the Business hired or retained during the Term shall be employees of Manager (or Manager's designated affiliate), and Manager shall be solely responsible for all wages, benefits, payroll taxes, and employment-related liabilities (including insurance for the employees). Manager is not a successor employer to the Debtor and shall have no liability for prepetition employment obligations.

    b. **Compliance.** Manager shall operate the Business in a safe and lawful manner and maintain all licenses and permits required for the interim operation, including health, safety, alcohol (if applicable), and data/privacy compliance.

10. **Intellectual Property; Data; FF&E.**

    a. **Limited License.** During the Term, the Trustee grants Manager a limited, non-exclusive, revocable, royalty-free license to use the Debtor's trade names, logos, and trademarks solely in connection with operating the Business at the Facility, which license shall automatically terminate upon the expiration or termination of this Agreement unless otherwise agreed in writing.

    b. **Data.** All first-party customer data, membership information, booking data, and operational/financial data generated from the Business shall be owned by the Estate prior to closing of the Sale; provided, that the Trustee shall provide Manager with access to such information during the Term; provided, further, that the foregoing shall not prohibit Manager from retaining anonymized and aggregated for benchmarking purposes.

    c. **FF&E; Supplies.** All furniture, fixtures, equipment, and supplies at the Facility owned by the Estate shall remain property of the Estate. Manager shall safeguard such property and maintain it in good working condition, reasonable wear and tear excepted. Manager shall have the right to permit any member of the Business to remove from the Facility items of personal property (including, without limitation, clothing, laptop computers, mobile telephones and other similar personal effects) upon the presentation of evidence of ownership of such items reasonably satisfactory to Manager.

11. **Insurance; Risk Management.** Manager shall maintain, at its expense, during the Term: (i) commercial general liability insurance with limits not less than $5,000,000 per occurrence and $10,000,000 in the aggregate naming the Trustee and Landlord as additional insureds; (ii) workers' compensation as required by law; and (iii) liquor liability if alcohol service resumes. Landlord shall provide Manager with Landlord's standard insurance certificate requirements which include a standard waiver of subrogation. Certificates of insurance shall be delivered to the Trustee and Landlord prior to reopening. Manager shall use commercially reasonable efforts to comply with Landlord's standard rules and regulations with respect to security and noise controls in connection with any events held at the Facility.

12. **Indemnification; Limitation of Liability**.

    a. **By Trustee**. The Trustee, solely in his capacity as trustee and only to the extent of the assets of the Estate, shall defend, indemnify, and hold harmless Manager and Landlord and their officers, directors, employees, agents, successors, and assigns, from and against any and all third-party claims, demands, causes of action, liabilities, damages, judgments, penalties, fines, costs, and expenses (including reasonable attorneys' fees and disbursements) ("Losses") to the extent arising out of the condition of the Facility or Estate-owned equipment existing prior to the Effective Date, except to the extent such claims are caused by the negligence or willful misconduct of Manager or Landlord, as applicable, or their respective employees, agents, or contractors.

    b. **Limitation of Liability**. EXCEPT IN THE CASE OF FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY FOR ANY CONSEQUENTIAL, SPECIAL, EXEMPLARY, INCIDENTAL, OR PUNITIVE DAMAGES, REGARDLESS OF THE THEORY OF LIABILITY AND EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

    c. **Landlord's Claims**. NOTHING IN THIS AGREEMENT SHALL BE DEEMED A WAIVER, COMPROMISE OR LIMITATION OF LANDLORD'S PRE-PETITION OR POST-PETITION CLAIMS AGAINST THE DEBTOR AND/OR ITS AFFILIATES OR THE ESTATE.

13. **Release**. The Trustee, on behalf of the Estate, hereby releases and forever discharges Manager and Landlord, and their affiliates, officers, directors, employees, agents, successors, and assigns from any and all Losses, whether known or unknown, arising out of or relating to the operation of the Business by Manager or Landlord during the Term, except to the extent arising from the fraud, gross negligence or willful misconduct of Manager or Landlord, as applicable.

14. **Landlord Consent; Access; Utilities**. Landlord consents to Manager's interim operation of the Business at the Facility during the Term and shall provide reasonable access, building services, and utilities customarily provided to the Facility, subject to building rules and reasonable coordination. Landlord shall have full access to the Facility during the Term of this Agreement.

15. **Venue; Governing Law**. This Agreement shall be governed by the laws of the State of New York, without regard to conflicts principles. The Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or relating to this Agreement to the fullest extent permitted by law.

16. **Notices**. All notices shall be in writing and delivered by email (with confirmation), nationally recognized overnight courier, or certified mail to the Parties at the addresses below (or as updated by notice).

    To Trustee:    Kenneth P. Silverman
                   kenneth.silverman@rimonlaw.com
                   100 Jericho Quadrangle, Suite 300
                   Jericho, New York 11753 516-4

|  |  |
|---|---|
| To Landlord: | 25 Park LLC<br>% Williams Equities<br>Michael Berger<br>michael.berger@colliers.com<br>1114 Avenue of the Americas, 11th floor<br>New York, NY 10036<br><br>William Stempel, Esq.<br>william.stempel@colliers.com<br>1114 Avenue of the Americas, 11th floor<br>New York, NY 10036 |
| To Manager: | CHG MSQ Manager, LLC<br>% Convene Hospitality Group<br>Daria Loshkareva<br>notices@convene.com<br>530 Fifth Avenue, Suite 710<br>New York, NY 10036 |

17. **Miscellaneous**.

   a. Entire Agreement. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter contained herein and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

   b. Amendments. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party hereto.

   c. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument. This Agreement may be executed and delivered electronically, including by email, PDF, DocuSign or other electronic delivery method, and such execution and delivery by any Party shall have the same effect as if such signature were an original.

   d. Confidentiality. Each Party shall keep strictly confidential, and shall not disclose to any third party, any non-public, proprietary, or confidential information received from the other Party in connection with this Agreement (collectively, "Confidential Information"), except (i) to the extent the receiving Party is required to make such disclosure by applicable law, regulation, or court order (including any order of a Bankruptcy Court or similar tribunal), provided that the receiving Party gives the disclosing Party prompt written notice of the requirement (to the extent legally permissible) and reasonably cooperates, at the disclosing Party's expense, with any efforts to seek a protective order or other appropriate remedy, (ii) to the receiving Party's and its affiliates' directors, officers, employees, agents, attorneys, accountants, and other professional advisors who have a need to know the

Confidential Information and who made aware of the confidentiality obligations set forth herein, or (iii) with the prior written consent of the disclosing Party. Notwithstanding the foregoing, Confidential Information shall expressly exclude any information (1) relating to Manager's operation of the Business or otherwise relating to the Business, Facility, Estate and/or Sale; (2) is at the time of disclosure generally known to the public; (3) becomes generally known to the public; (4) is or becomes available to the receiving Party on a non-confidential basis from a third party other than the disclosing Party; or (5) was in the possession of the receiving Party at the time of communication by the disclosing Party. The obligations of this Section shall survive any termination or expiration of this Agreement for a period of one (1) year thereafter.

e. Assignment; Binding Effect. Neither this Agreement nor any of the rights or obligations hereunder may be assigned, delegated, or otherwise transferred by any Party without the prior written consent of the other Party, and any attempted assignment without such consent shall be null and void. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

f. Severability. If any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law, (i) such provision shall be deemed modified to the minimum extent necessary to make it valid, legal, and enforceable while preserving to the fullest extent possible the Parties' original intent, and (ii) the remaining provisions of this Agreement shall remain in full force and effect.

g. No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective permitted successors and assigns, and nothing herein, express or implied, is intended to confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

h. Further Assurances. Each Party agrees, upon the reasonable request of the other Party, to execute and deliver such additional documents, instruments, and assurances, and to take such further actions, as may be reasonably necessary or desirable to carry out the purposes of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date and year first set forth above.

**TRUSTEE:**

_____
Kenneth Silverman, Esq.
Chapter 7 Trustee for the Estate of NeueHouse, Inc.

**LANDLORD:**

25 Park LLC,
a Delaware limited liability company

_____
By: Robert Getreu
Its: Managing Member

**MANAGER:**

CHG MSQ Manager, LLC,
a Delaware limited liability company

_____
By: Ryan Simonetti
Its: Chief Executive Officer