**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

        NeueHouse Inc., *et al*.

                    Debtors.

**FOR PUBLICATION**

Case No. 25-11937 (MG)

Chapter 7
(Jointly Administered)

**MEMORANDUM OPINION AND ORDER DENYING MOTION OF STRIPE LLC FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

*A P P E A R A N C E S:*

DLA PIPER LLP (US)
*Attorneys for Stripe LLC*
1251 Avenue of the Americas
New York, New York 10020
By:    Gregory M. Juell, Esq.

RIMON P.C.
*Attorneys for the Chapter 7 Trustee Kenneth P. Silverman*
100 Jericho Quadrangle Suite 300
Jericho, New York 11753
By:    Ronald J. Friedman, Esq.
       Brian Powers, Esq.
       Courtney M. Roman, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested *Motion of Stripe, LLC for Allowance and Payment of Administrative Expense Claim* (the "Motion," ECF Doc. # 113) in *In re NeueHouse Inc..* (Case No. 25-11937). The Motion seeks entry of an order granting the allowance of $813,085.00 as an administrative expense for postpetition services provided to the jointly administered bankruptcy estates of NeueHouse Inc., fdba Cultureworks Inc., fdba Fotografiska Neuehouse Inc. (the "Debtors") pursuant to Stripe's service agreement (the "Services Contract") for two separate accounts. Stripe is a company that provides

1

credit card and related processing services to the Debtors in exchange for transaction

charges.  (Motion ¶ 10.)

The Debtors filed an objection (the "Debtors' Objection," ECF Doc. # 120),

arguing that the Motion should be denied as Stripe had failed to establish that their

obligation arose out of a postpetition agreement and was an "actual and necessary" cost

of preserving the Debtors' estates.  (Debtors' Objection ¶ 12.)  The chapter 7 trustee,

Kenneth P. Silverman (the "Trustee") also filed a declaration in support of the Objection

("Silverman Declaration," ECF Doc. # 120-1).  On May 12, 2026, Stripe filed a reply (the

"Reply," ECF Doc. # 122) in support of the Motion.

For the reasons discussed below, the Court **SUSTAINS** the Objection and

**DENIES** the Motion.

## I.    <u>BACKGROUND</u>

### A.  The Services Contract and Petition

The Debtors operated a chain of members-only clubs used for various purposes,

including weddings and corporate events.  (Motion ¶ 7.)  Before the Petition Date, the

Debtors and Stripe entered the Services Contract for two separate accounts pursuant to

which Stripe would provide credit card and related processing services to the Debtors in

exchange for transactional charges.  (*Id.* ¶ 10.)  As part of this process, Stripe honored

chargebacks initiated by customers who disputed transactions, funding the chargebacks

from its own accounts and creating an obligation for the Debtors to repay Stripe.  (*Id.*)

On September 5, 2025 (the "Petition Date"), the Debtors filed a voluntary petition

for relief under chapter 7 of the bankruptcy code.  (the "Petition," ECF Doc. # 1.)  Stripe

did not enter into any new or additional postpetition agreements with the Debtors or

Trustee but continued to process charges for the Debtors' business, under a new account held by CHG. (Motion ¶ 10.) Since the Petition Date, Stripe has honored postpetition chargebacks for the Debtors' customers' prepetition transactions, totaling $813,085.00. (*Id.* ¶ 14, Exhibit B.)

### B. The CHG Management Agreement

CHG is part of a global hospitality platform with the infrastructure and expertise to preserve and enhance the Debtors' value for a potential sale of the Debtor's assets. ("CHG Declaration," ECF Doc. # 18-3 ¶ 10.) On September 26, 2025, CHG entered into an agreement with Stripe for the management of the Debtors' Madison Square location. (The "Management Agreement," ECF Doc. # 18-2; the "Management Agreement Order," ECF Doc. # 21.)

Under the Management Agreement, the Debtors remained responsible for prepetition chargebacks:

> The Estate shall remain responsible for prepetition credit-card chargebacks and customer claims relating to periods before the Effective Date; provided, however, that if a chargeback directly relates to a Customer Deposit that Manager has already applied for an event performed during the Term, the Parties shall confer in good faith to equitably allocate responsibility based on benefit received.

(The "Management Agreement," ECF Doc. # 18-2 ¶ 5(d).)

The Management Agreement includes terms of CHG's operation of the Debtors' Madison Square location, such as, among other things, assuming all operational expenses, maintaining all services provided by the Debtors, and managing personnel. (CHG Decl. ¶ 11.)

On December 18, 2025, the Court entered an order approving the Trustee's private sale of certain assets to CHG. (ECF Doc. # 73.)

3

## C. Stripe's Motion

On April 9, 2026, Stripe filed the Motion for entry of an order under section 503 of the Code to allow and direct prompt payment of administrative expense claims in the amount of $813,085.00. (Motion ¶ 15, Exhibit C.) Stripe claims the postpetition chargebacks qualify as administrative expenses and must therefore be paid out in full. (*Id.* ¶¶ 15-16.) Stripe asserts that their ongoing contract with the new management company, CHG, and lack of rejection of the original Services Contract support inducement. (*Id.* ¶¶ 11,19-20.) Stripe indicates that these chargebacks further provide a "direct and substantial benefit to the estates" and thus must be allowed as an administrative expense. (*Id.* ¶ 22.) Stripe believes that payment processing and chargeback services are essential to the Debtors' customer goodwill, which, in turn, avoids reputational harm. (*Id.* ¶ 20.) Stripe further asserts that courts have consistently recognized the integral nature of credit card chargebacks to the maintenance of cash management. (*Id.* ¶ 21.) Stripe believes that because their claims provide direct and necessary benefits to the estate, they should be deemed administrative expenses. (*Id.* ¶ 24.)

## D. The Debtors' Objection

The Debtors object, asserting Stripe has failed to meet its burden of proving entitlement to priority status as the expenses neither arose from a postpetition transaction nor conferred actual and substantial benefits to the estate. (Objection ¶¶ 11-14.) The Debtors assert that the Services Contract was a prepetition obligation, and no additional postpetition agreement was entered. (*Id.* ¶ 17.) They argue that, after filing chapter 7 petitions, they were legally incapable of operating the business and could not have implied inducement to continue to process chargebacks. (*Id.* ¶¶ 18-21.) The Debtors

4

point out that the chargebacks did not "preserve the estates' assets or generate revenue for the benefit of the creditors" and therefore did not confer any actual or necessary benefits. (*Id.* ¶ 28.) The Debtors assert that Stripe performed services for CHG under an entirely separate contract which had no impact upon the purchase price negotiations of Debtors' real estate. (Objection ¶¶ 8, 29.) Because the Services Contract neither arose postpetition nor conferred a benefit upon Neuehouse, the Debtors argue that Stripe's claim should not be considered an administrative expense.

### E.  Stripe's Reply

Stripe responds with an assertion that the Debtors too narrowly construed the interpretation of the relevant test. (Reply ¶ 5.) Stripe argues that inducement occurred through inaction as the Services Contract was not automatically rejected. (*Id.* ¶¶ 6-7.) Stripe also rejects the Debtors' argument that revenue generation is a required component to material benefit. (*Id.* ¶ 9-11.) Stripe asserts that such priority is necessary and that determining otherwise would both "chill the creditors' willingness to extend credit, and ultimately, frustrate the goal of rehabilitation." (*Id.* ¶¶ 11-14.) Stripe believes that the Debtors' postpetition conduct recognized payment processing (and chargebacks) to be a necessary component of continuing operations and must therefore be allowed as an administrative expense. (*Id.* ¶ 15-18.)

## II.    LEGAL STANDARD

Section 503(b)(1)(A) of the Bankruptcy Code provides special priority for "actual, necessary costs and expenses of preserving the estate . . . for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). This priority is meant to facilitate a debtor's reorganization efforts and encourage third parties to do business

5

with the debtor. *Amalgamated Ins. Fund v. McFarlin's Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) ("Congress granted priority to administrative expenses in order to facilitate the efforts of the trustee or debtor in possession to rehabilitate the business for the benefit of all the estate's creditors. Congress reasoned that unless the debts incurred by the debtor in possession could be given priority over the debts which forced the estate into bankruptcy in the first place, persons would not do business with the debtor in possession, which would inhibit rehabilitation of the business and thus harm the creditors." (Internal citation omitted.) Accordingly, an expense is administrative only if it (i) "arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession" and (ii) "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." *Id.* (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir. 1976)); *see also In re Global Metallurgical, Inc.*, 312 B.R. 34, 40 (Bankr. S.D.N.Y. 2004) (stating the same).

Generally, a "debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate." *Amalgamated*, 789 F.2d at 101. It is "only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the debtor—give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration." *Mammoth Mart*, 536 F.2d at 955.

Additionally, administrative priority generally requires evidence of tangible, "concrete benefit[s]" to the Debtors' estates. *In re Enron Corp.*, 279 B.R. 695, 706 (Bankr. S.D.N.Y. 2002). Where a claim arises out of a contract between the debtor and

6

the claimant, the "creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of business." *Mammoth Mart*, 536 F.2d at 954.  Any "speculative benefit or the mere potential for benefit is not enough to warrant an administrative claim priority."  *Enron*, 279 B.R. at 706.  To constitute an "actual and necessary cost under section 503(b)(1)(A), [the movant] must establish that the amount charged was reasonable for the value or benefit conferred on the estate."  *In re Bake-Line Grp., LLC*, 312 B.R. 48, 51 (Bankr. D. Del. 2004).  "Unreasonable expenses, while they may be actual costs, are not 'necessary' costs to a bankruptcy estate."  *Id.* at 52.  The burden to establish entitlement to administrative priority rests with the claimant.  *In re Chateaugay Corp.*, 102 B.R. 335, 353–54 (Bankr. S.D.N.Y. 1989).

## III.   <u>DISCUSSION</u>

### A.  The Transactions at Issue Do Not Arise After the Trustee Began Managing the Estate

Generally, a "debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate."  *Amalgamated*, 789 F.2d at 101.  Moreover, the general presumption is to narrowly construe administrative expense priorities to maximize the value of the estate for the creditors.  *See In re Hemingway Transp.*, 954 F.2d 1, 4-5 (1st Cir. 1992); *In re Colortex Industries, Inc.*, 19 F.3d 1371, 1377 (11th Cir. 1994).  There is no indication that Stripe's claim arises from the Debtors' postpetition actions, and it is undisputed that Stripe did not enter into a postpetition contract with the Debtors.  (Objection. ¶ 17.)  Furthermore, courts have previously recognized tort claims that arise postpetition but derive from a prepetition

defect do not constitute administrative expense claims. *See, e.g., Piper Aircraft Corp. v. Calabro (In re Piper Aircraft Corp.)*, 169 B.R. 766 (Bankr. S.D. Fla. 1994) (ruling in the tort context). Here, it is undisputed that the chargebacks, which were processed postpetition, derive from transactions that occurred prepetition, from a prepetition contract. (Objection ¶¶ 8,17.) As such, Stripe cannot meet the requirement that the transactions arose after the Trustee began managing the estate.

Stripe further alleges that the Debtors' actions induced Stripe's services. (Motion ¶ 19.) In the absence of a postpetition contract, inducement, via either direct request or a knowing and voluntary postpetition acceptance, can satisfy the transaction arising with the estate requirement. *See Nabors Offshore Corp. v. Whistler Energy II, LLC (In re Whistler Energy II, LLC)*, 931 F.3d 432, 443 (5th Cir. 2019). Here, the Debtors' inaction is not sufficient proof of a knowing and voluntary acceptance of Stripe's services, as there was no affirmative step taken towards acceptance. (Objection ¶ 18; *see NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (explaining that once a debtor in possession *elects* to assume the executory contract it can be treated as an administrative expense) The Debtors did not communicate with Stripe postpetition, and the Trustee was legally incapable of operating the business or processing transactions until the Court entered the 721 Motion on September 22, 2025. (Objection ¶¶ 9,19-20.) Stripe's actions were not induced by the estate but rather flowed from prepetition contractual obligations. (*Id.* ¶ 24; *see In re Swallen's Inc.*, 210 B.R. 120, 123 (Bankr. S.D. Ohio 1997) (finding no inducement when a bank continued to process postpetition chargebacks under a prepetition agreement).) Accordingly, Stripe has failed to meet its burden of proving entitlement to administrative expense status as the claims do not arise postpetition.

### B. The Estate Did Not Receive a Benefit from Stripe's Claims

Stripe also failed to meet its burden of proving that the estate received a benefit from the postpetition services. Stripe's chargebacks provide no operational benefit postpetition and are unnecessary expenses to the preservation of the estate (as the benefit was only enjoyed by the prepetition Debtors). (Objection ¶ 28; *see Swallen's*, 210 B.R. at 123 (concluding that chargebacks based on prepetition sales conferred a benefit on the prepetition debtor, not the debtor in possession.) Rather, CHG assumed control of operations and entered into its own contract with Stripe, and neither the Debtors nor the Trustee benefit from cash management services postpetition. (Objection ¶ 8; *see Enron*, 279 B.R. at 706 ("In order for a creditor's claim to be entitled to administrative status, there must be actual use of the creditor's property by the debtor-in-possession . . . [a]ctual use confers a 'concrete benefit on the estate' thereby entitling a claimant to an administrative expense claim.").) Courts are more likely recognize cash management systems as administrative expenses when the purpose is rehabilitation, not liquidation. *See, e.g., In re Benitago Inc., et al.*, Case No. 23-11394 (SHL) (Bankr. S.D.N.Y. Jan. 19, 2024) [D.I. 374]; *In re Voyager Digital Holdings, Inc.*, et al., Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Feb. 8, 2023) [D.I. 983]. Here, the Debtors no longer operate the business and have no intention of rehabilitation and therefore cannot receive a benefit from cash management systems.

Operational benefits are not the only way for the Debtors to benefit from Stripe's services, however. Seamless cash management systems and the honoring of chargebacks help businesses run uninterrupted operations and build a strong reputation, which is especially important for a members-only business. (Motion ¶ 20.) The Trustee noted that a loyal membership base is imperative to preserve the estate's assets during the petition

9

period.  (CHG Decl. ¶¶ 9,20.)  Nonetheless, the Debtors assert that customer goodwill had no impact on the Trustee's negotiations with CHG, as the purchase price was negotiated prepetition and neither party was aware of the chargebacks.  (Objection ¶ 29.) Furthermore, CHG's subsequent contract with Stripe post purchase is strong evidence that they viewed the Services Contract as distinct from the Debtors' estate.  (Reply ¶ 16.) The benefit of "customer goodwill" seems more speculative and conclusory than not.  *See Enron,* 279 B.R. at 706. (stating that "speculative benefit or the mere potential for benefit is not enough to warrant an administrative claim priority").  Accordingly, Stripe failed to meet its burden of proving a benefit to the Debtors' estate.

## IV.    CONCLUSION

For the reasons discussed above, the Court **SUSTAINS** the Objection and **DENIES** the Motion.


**IT IS SO ORDERED.**

Dated:    July 14, 2026
          New York, New York


                                        *Martin Glenn*
                                        MARTIN GLENN
                                Chief United States Bankruptcy Judge

10